**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

INTERNATIONAL BROTHERHOOD )
OF ELECTRICAL WORKERS, )
LOCAL UNION NO. 5, AFL-CIO, )
                          )
        **Plaintiff,** )
                          )
      **v.** )        **CIVIL ACTION NO. 08-63J**
                          )
**KRATER SERVICES, LLC,** )        **JUDGE GIBSON**
                          )
       **Defendant.** )

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

    This matter comes before the Court on cross-motions for summary judgment filed by Defendant Krater Services, LLC ("Krater Services"), and Plaintiff International Brotherhood of Electrical Workers, Local Union No. 5, AFL-CIO (the "Union"), on April 26, 2010. ECF Nos. 48 & 53. For the reasons that follow, the motion for summary judgment filed by Krater Services (*ECF No. 48*) will be granted, and the motion for summary judgment filed by the Union (*ECF No. 53*) will be denied.

### II. BACKGROUND

    Krater Electrical Services, Inc. ("Krater Electric"), was owned by Kenneth R. Krater, Sr. ("Kenneth"), and his wife, Hazel M. Krater ("Hazel"). ECF Nos. 55 & 58 at ¶ 21. The company provided heating, ventilating and air conditioning ("HVAC"), electrical, telecommunications, insulation, telephone, Cat-5/fiber cabling, maintenance and repair services to residential and commercial customers throughout central Pennsylvania. *Id.* at ¶¶ 84-85. Kenneth's grandson,

Bradley Krater ("Bradley"), worked for Krater Electric from 1991 through 2007. *Id.* at ¶ 87. During the latter portion of his time at Krater Electric, Bradley served as the Vice President of Operations. *Id.* at ¶ 88. His wife, Shannon Krater ("Shannon"), worked for Krater Electric from 1991 through 1993. *Id.* at ¶ 106. She returned to Krater Electric in 2003. *Id.* Shannon became the Office Manager in 2004 and remained in that position until August 2007. *Id.*

On November 4, 1991, Krater Electric executed a letter of assent authorizing the Western Pennsylvania Chapter of the National Electrical Contractors Association ("NECA") to act as its collective bargaining representative with respect to any current or future labor agreements between itself and the Union. *Id.* at ¶ 1. In 2001, the NECA negotiated a collective bargaining agreement ("CBA") with the Union that was to be in effect from December 27, 2002, through December 23, 2005. *Id.* at ¶ 2. Grievances and disputes arising under the CBA were governed by Articles 1-7, 1-8 and 1-9, which provided:

> 1-7 All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.
>
> 1-8 All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties thereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.
>
> 1-9 Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding on both parties thereto.

ECF No. 55-2 at 3. Article 4-2 of the CBA designated the Union as "the sole and exclusive source of referral of applicants for employment." *Id.* at 4. Article 4-3 gave Krater Electric "the right to reject any applicant" for "just cause." *Id.* Pursuant to Article 4-4, the Union was

2

required to "select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union . . . ." *Id.* On August 19, 2005, the NECA and the Union executed a new CBA covering the period of time beginning on December 23, 2005, and ending on December 26, 2008. The provisions of the new CBA governing grievances, disputes and the hiring of applicants were not materially different from those contained in the previous CBA.[1] ECF No. 55-4 at 4, 6.

In a grievance letter to Kenneth dated October 26, 2006, John Chalovich ("Chalovich"), the Union's Business Manager and Financial Secretary, accused Krater Electric of "utilizing individuals to perform work" within the scope of the CBA who had not been hired from the Union's "exclusive hiring hall." ECF No. 55-5 at 1. Chalovich also accused Krater Electric of improperly changing the classifications of covered employees at its own discretion and directly negotiating wages, benefits and other conditions of employment with covered employees. *Id.* The Union requested, among other things, that Krater Electric pay "all lost wages and benefits" to those individuals "who should have been referred from the hiring hall" but were not hired. *Id.*

The grievance was apparently not resolved within 48 hours, thereby necessitating a referral of the matter to the Labor-Management Committee. A hearing was conducted on November 20, 2006. ECF No. 55-3 at 1. The Labor-Management Committee concluded that Krater Electric had violated the CBA by utilizing employees who had not been referred from the Union's "exclusive hiring hall" to perform electrical work from January 2005 to the time of the hearing. *Id.* at 3. It was also determined that Krater Electric had improperly changed the classifications of several employees "in an effort to circumvent the referral provisions" of the CBA. *Id.* The Labor-Management Committee further observed that Krater Electric had not

---

[1] The new CBA renamed Articles 1-7, 1-8 and 1-9 as Articles 1.06, 1.07 and 1.08, respectively. ECF No. 55-4 at 4. Articles 4-2, 4-3 and 4-4 were renamed as Articles 4.02, 4.03 and 4.04, respectively. *Id.* at 6.

withdrawn its authorization for the NECA to bargain on its behalf, and that it remained subject to the provisions of the second CBA through December 26, 2008. *Id.* Krater Electric was ordered to pay wages, benefits and union dues to "applicants registered for employment" with the Union's "exclusive hiring hall" "for each and every hour of commercial and/or residential electrical work" performed by employees who had not been referred by the Union, to make appropriate payments to certain trust funds established by the CBA, and to stop assigning electrical work to employees who had not been referred in conformity with the CBA. *Id.* at 3-4.

The Union commenced an enforcement action in this Court against Krater Electric on April 2, 2007, alleging that Krater Electric had not complied with the Labor-Management Committee's decision. Civil Action No. 07-74, ECF No. 1 at ¶ 18. Bradley and Shannon submitted their resignations to Krater Electric on August 3, 2007. ECF Nos. 50 & 60 at ¶ 1. Their resignations were to be effective on August 30, 2007. *Id.* On August 8, 2007, Bradley and Shannon created Krater Services. ECF No. 55-10. Shannon owned a 51% interest in Krater Services, while Bradley owned a 49% interest in the company. ECF Nos. 55 & 58 at ¶ 20. They apparently decided to divide their ownership in this manner so that Krater Services could be classified as a Woman's Business Enterprise ("WBE"). *Id.* They cashed out Bradley's individual retirement account ("IRA") in order to finance the creation of Krater Services. ECF Nos. 50 & 60 at ¶ 2. Additional financial assistance came from money provided by Shannon's parents and a business loan obtained from the Altoona Blair County Development Corporation ("ABCD Corp."). *Id.*

Krater Electric's Board of Directors conducted a "special meeting" on September 1, 2007. ECF No. 55-8. The official minutes of the meeting, which were recorded by Hazel, consisted of the following:

4

> A special meeting of the Board of Directors was called to consider the IBEW Grievance charge.
>
> After many meetings, beginning in February 2007 with our Attorney, and with no progress in resolving the charge but rather a definite hardening in IBEW's position, the decision was made to dissolve the said Corporation.
>
> Attached is the Resolution of the Board of Directors, and Plan of Complete Liquidation signed by Kenneth R. & Hazel M. Krater, Board of Directors.

*Id.* That same day, nine non-union employees of Krater Electric were hired by Krater Services.[2] ECF Nos. 50 & 60 at ¶ 3; ECF No. 55-13. Krater Services did not seek applications from electricians who had not worked for Krater Electric. ECF No. 55 at ¶ 45. The employees of Krater Services were paid the same salaries that they had previously been paid while working for Krater Electric. ECF Nos. 55 & 58 at ¶ 46. Krater Services subsequently completed some projects that had been started by Krater Electric prior to its dissolution.[3] *Id.* at ¶¶ 57-64.

Krater Services never purchased assets, equipment or property owned by Krater Electric. *Id.* at ¶ 4. The only piece of equipment owned by Krater Electric that was utilized by Krater Services was an insulation trailer that was rented out at fair market value. *Id.* at ¶ 5. Bradley and Shannon never had ownership interests in Krater Electric. ECF Nos. 50 & 60 at ¶ 6. They were neither officers of Krater Electric nor members of its Board of Directors. *Id.* Kenneth never owned or worked for Krater Services. *Id.* at ¶ 8. After forming Krater Services, Bradley and Shannon started to operate their business out of their personal residence in Altoona, Pennsylvania, which was just 2.6 miles away from the former business location of Krater Electric. ECF Nos. 55 & 58 at ¶¶ 120-121.

---

[2] The Union had already disclaimed its interest in representing the nine employees by the time that they were hired by Krater Services. ECF No. 52-5.

[3] Kenneth formally notified the Union of Krater Electric's dissolution in a letter dated October 17, 2007. ECF No. 61-1 at 3.

The Union commenced this action against Krater Services on March 10, 2008, alleging that Krater Services was an "alter ego" of Krater Electric and, therefore, responsible for its obligations under the Labor-Management Committee's decision of November 20, 2006. ECF No. 1 at ¶¶ 19, 26-28. The Union also alleged that Krater Services was "bound by any and all orders" entered by this Court in the separate enforcement action against Krater Electric. *Id.* at ¶ 29. Krater Services filed a motion to dismiss on April 22, 2008, challenging both the Court's subject-matter jurisdiction to adjudicate this action and the sufficiency of the allegations contained in the Union's complaint. ECF Nos. 4 & 5.

The Court was later advised that the Union and Krater Electric had decided to settle the dispute at issue in the earlier enforcement action. Civil Action No. 07-74J, ECF No. 28. In a stipulation dated September 8, 2008, the parties agreed that a judgment enforcing the Labor-Management Committee's decision would be entered in favor of the Union and against Krater Electric, and that the Union was entitled to a payment in the amount of $1,022,623.12. Civil Action No. 07-74J, ECF No. 30 at ¶ 1. The parties further agreed that the settlement agreement in that action would not "impair" the Union's right to proceed against Krater Services in this action. *Id.* at ¶ 3.

The motion to dismiss filed by Krater Services was denied in a memorandum opinion and order dated March 9, 2009. ECF No. 28. The parties filed cross-motions for summary judgment on April 26, 2010. ECF Nos. 48 & 53. These motions are the subject of this memorandum opinion.

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED.

6

R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. JURISDICTION AND VENUE

Jurisdiction in this case is predicated on 28 U.S.C. § 1331 and 29 U.S.C. § 185(a). Venue is proper under 28 U.S.C. § 1391(b).

7

## V. DISCUSSION

This action arises under the Labor Management Relations Act of 1947 ("LMRA" or "Act") [29 U.S.C. § 141 *et seq.*]. Section 301(a) of the LMRA, which is codified at 29 U.S.C. § 185(a), provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). The substantive law to be applied in suits arising under this statutory provision "is federal law, which the courts must fashion from the policy of our national labor laws." *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In this vein, § 185(a) has been construed to "authoriz[e] federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements." *Granite Rock Co. v. International Brotherhood of Teamsters*, ___U.S.___, ___, 130 S.Ct. 2847, 2864, 177 L.Ed.2d 567 (2010)(brackets in original), quoting *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). The United States Supreme Court has explained that § 185(a) provides a federal court with jurisdiction to determine "whether a plaintiff is entitled to relief for [a] defendant's alleged violation" of a collective bargaining agreement. *Textron Lycoming Reciprocating Engine Division v. United Automobile, Aerospace & Agricultural Implement Workers of America*, 523 U.S. 653, 658, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998).

In this case, the Union contends that Krater Services is responsible for Krater Electric's admitted breach of the CBA. ECF No. 1 at ¶¶ 27-29. This contention is premised on the Union's assertion that Krater Services is an "alter ego" of Krater Electric. *Id.* at ¶¶ 19-26. "[I]f two entities are found to be alter egos, a collective bargaining agreement covering one entity is

automatically deemed to cover the other." *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 145 (3d Cir. 1994). Krater Services argues that it is not an alter ego of Krater Electric and, therefore, not responsible for fulfilling Krater Electric's obligations to the Union under the CBA, the Labor-Management Committee's decision, and the stipulated judgment entered by this Court in the earlier enforcement action. ECF No. 49 at 2-7. Since it has already been determined that Krater Electric violated the CBA, the only factual question disputed in this case is whether Krater Services is an alter ego of Krater Electric. ECF No. 28 at 4-5.

## A.     The Timeliness of this Action

Before reaching the central question presented in this case, the Court must address a preliminary issue raised by Krater Services concerning the timeliness of this enforcement action. Krater Services contends that this action is barred by 29 U.S.C. § 160(b), which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of [a] charge with the [National Labor Relations] Board . . . ." 29 U.S.C. § 160(b). Bradley and Shannon created Krater Services on August 8, 2007. ECF No. 55-10. The resignation notices that they submitted to Krater Electric became effective on August 30, 2007, and Krater Services was apparently operating as of September 1, 2007. ECF No. 49 at 2. This action was commenced on March 10, 2008.[4] ECF No. 1. Krater Services argues that the Union's claim is time-barred, since more than six months elapsed between the challenged "unfair labor practice" and the commencement of this action. ECF No. 49 at 2.

By its very terms, the six-month statute of limitations established by § 160(b) applies to complaints issued by the National Labor Relations Board ("NLRB"). 29 U.S.C. § 160(b). Since Congress never enacted a statute of limitations governing actions brought under § 185(a), the

---

[4] Although the complaint was dated March 4, 2008, it was not electronically filed until March 10, 2008. ECF No. 1. This six-day discrepancy is not material to the statute-of-limitations defense raised by Krater Services. ECF No. 49 at 2.

timeliness of a suit arising thereunder is ordinarily determined by reference to the most analogous state statute of limitations. *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 60, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163-172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court "borrowed" § 160(b)'s six-month limitations period for "hybrid" actions brought under § 185(a) because state law provided "no close analogy" to the federal cause of action. Speaking through Justice Brennan, the Supreme Court explained that such a "hybrid" action involved both a claim against an employer for violating a collective bargaining agreement and a claim against a union for breaching its duty of fair representation. *DelCostello*, 462 U.S. at 164-165. Because no analogous cause of action existed under state law, the Supreme Court found it more appropriate to apply the six-month statute of limitations established by § 160(b). *Id.* at 171. Nonetheless, the Supreme Court stressed that its holding was limited to "hybrid" claims, and that federal courts were not to eschew reliance on state statutes of limitations in other contexts merely because no "perfect" analogies existed under state law. *Id.*

In *Service Employees International Union 36 v. City Cleaning Co., Inc.*, 982 F.2d 89, 95 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit found Pennsylvania's six-year statute of limitations for breach-of-contract actions to be applicable to a "pure" LMRA action seeking "to enforce an arbitrator's award under a collective bargaining agreement." Pennsylvania subsequently reduced the applicable limitations period to four years. 42 PA. CONS. STAT. § 5525(a). In any event, Pennsylvania's statute of limitations governing contractually-based claims is applicable to this enforcement action. *Office & Professional Employees International Union v. Brownsville General Hospital*, 186 F.3d 326, 336 (3d Cir. 1999). The Union commenced this action within the applicable four-year limitations period regardless of

whether its alter-ego claim accrued at the time of Krater Services' formation or on the date that the resignations submitted to Krater Electric by Bradley and Shannon became effective. Therefore, the Court must consider the merits of that claim.

## B.     The Union's Alter-Ego Claim

The National Labor Relations Act ("NLRA") [29 U.S.C. § 151 *et seq.*] and the LMRA define the term "employer" broadly enough to include "any person acting as an agent of an employer, directly or indirectly . . . ." 29 U.S.C. §§ 142(3), 152(2). In *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942), the Supreme Court suggested that where an entity purporting to be a new employer merely constituted "a disguised continuance of [an] old employer," it could be regarded as the same "employer" as its predecessor for the purpose of determining its obligations under an earlier collective bargaining agreement.  The Supreme Court explained that only "a *bona fide* discontinuance" of the old employer, and a concomitant "true change of ownership," would relieve the new employer of its need to satisfy the old employer's obligations under a preexisting collective bargaining agreement. *Southport Petroleum*, 315 U.S. at 106.  It was determined that the NLRB could decide this "question of fact" in the first instance. *Id.*  The Supreme Court referred to this issue again in *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 259, n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).  In *Howard Johnson*, the Supreme Court stated that "alter ego" cases "involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management."

The "primary responsibility for developing and applying national labor policy" lies with the NLRB. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 108

11

L.Ed.2d 801 (1990). Subsequent to the Supreme Court's decisions in *Southport Petroleum* and *Howard Johnson*, the NLRB declared that two enterprises are to be treated as alter egos of each other where their ownership, management, business purposes, operations, equipment, customers and supervisors are deemed to be "substantially identical." *Crawford Door Sales Co.*, 226 N.L.R.B. 1144 (1976). The NLRB also considers whether the creation of one entity was designed to help another entity evade its responsibilities under a preexisting collective bargaining agreement in determining whether the two entities should be regarded as alter egos of one another. *Advance Electric, Inc.*, 268 N.L.R.B. 1001, 1002 (1984). The United States Court of Appeals for the Third Circuit has found the NLRB's construction of the word "employer" to be reasonable. *Stardyne*, 41 F.3d at 147-148. Consequently, that construction is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[5]

The Union contends that Krater Services is an alter ego of Krater Electric. ECF No. 54 at 3-4. In order to determine whether an alter-ego relationship exists between Krater Services and Krater Electric, the Court must consider whether there is a "substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the two corporations." *Eichleay Corp. v. International Association of Bridge, Structural & Ornamental Iron Workers*, 944 F.2d 1047, 1059 (3d Cir. 1991). Consideration must also be given to whether Krater Services was created for the very purpose of permitting Krater Electric to evade its responsibilities to the Union under the CBA and the Labor-Management Committee's decision of November 20, 2006. *Stardyne*, 41 F.3d at 146-147. In any event, the "ultimate focus" of the

---

[5] In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court held that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency" under circumstances in which a legislative scheme provides the agency with an explicit or implicit "delegation of authority to elucidate a specific provision of the statute by regulation."

12

inquiry centers on whether Krater Services is merely a "disguised continuance" of Krater Electric resulting from "a sham transaction or a technical change in [Krater Electric's] operations." *Eichleay Corp.*, 944 F.2d at 1059, quoting *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 508 (5th Cir. 1982).

Krater Electric was owned by Bradley's grandparents, Kenneth and Hazel. ECF Nos. 55 & 58 at ¶ 21. Krater Services is owned by Bradley and Shannon. *Id.* at ¶ 20. The ownership of the two entities cannot be fairly characterized as "substantially identical." "While substantially identical ownership is not a *sine qua non* of alter-ego status, it is an important factor." *US Reinforcing, Inc.*, 350 N.L.R.B. 404 (2007)(emphasis in original). An alter-ego relationship can exist between two entities in the absence of common ownership only where both companies are "wholly owned by members of the same family," where the two companies are "nearly totally owned by the same individual," or where "the older company continue[s] to maintain substantial control over the business claimed to have been sold to the new company." *Superior Export Packing Co., Inc.*, 284 N.L.R.B. 1169, 1170 (1987).

The Union argues that it has satisfied the "ownership prong" of the "alter-ego test" by showing that Krater Services, like Krater Electric, is owned by members of the Krater family. ECF No. 54 at 15. The NLRB has recognized "a close familial relationship" between individual owners as a basis for establishing an ownership link between separately-owned entities. *Image Convention Services, Inc.*, 288 N.L.R.B. 1036, 1039 (1988). In *Trafford Distribution Center v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit observed that "substantially identical ownership may be found where two enterprises are owned by members of the same family." The ownership inquiry, however, does not stop once it is determined that a familial relationship exists between the owners of the entities involved.

Instead, the inquiry "looks to the totality of the circumstances to determine where the real control exists." *East Tennessee Packing Co.*, 270 N.L.R.B. 520, 524 (1984)(stating that a finding of common ownership based on the familial relationship between two cousins would be justified only if the interests of one were "totally under the influence and control" of the other). As the United States District Court for the Southern District of New York explained in *Local Union No. 38 v. A&M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F.Supp.2d 332, 349 (S.D.N.Y. 2004), "courts look behind the corporate form and presume common ownership only when there [is] a strong showing of common control." For example, the Court of Appeals affirmed an administrative finding of common ownership between entities separately owned by a husband and wife in *Trafford Distribution Center* because the record contained evidence suggesting that the husband was essentially controlling both entities. *Trafford Distribution Center*, 478 F.3d at 176, 179-180. In order to overcome the "nominally separate ownership" of Krater Electric and Krater Services, the Union must demonstrate that one member (or group of members) of the Krater family has exercised substantial control over both entities. *Local Union No. 38*, 314 F.Supp.2d at 349-350.

On November 3, 2009, Bradley testified that he had exercised no authority to negotiate contracts during the course of his employment with Krater Electric. ECF No. 55-11 at 4; Bradley Krater Dep. at 11. He explained that he had not enjoyed any power to hire or fire employees. ECF No. 55-11 at 4; Bradley Krater Dep. at 11-13. Bradley stated that Kenneth had been unwilling to relinquish control over Krater Electric. *Id.* Although Bradley had been "involved" with the day-to-day operations of the business, he asserted that Kenneth had continued to make "all final decisions" concerning important business operations. ECF No. 55-11 at 5; Bradley Krater Dep. at 17.

14

Kenneth and Hazel were on Krater Electric's Board of Directors. ECF No. 55-8. Bradley acknowledged that Hazel's health had been poor during the summer of 2007, and that she had not been directly involved with the operations of the business. ECF No. 55-11 at 5; Bradley Krater Dep. at 17. Nevertheless, Bradley testified that he had never attended a Board meeting at Krater Electric, and that Kenneth and Hazel had been the entity's primary shareholders. ECF No. 55-11 at 6; Bradley Krater Dep. at 18-19. While Bradley had been allowed to bid on jobs in his capacity as Krater Electric's Vice President of Operations, he stated that bids worth more than $2,500.00 had required the prior approval of either his grandfather or his father before they could be finalized. *Id.*

Shannon's employment with Krater Electric was sporadic. Unlike Bradley, who continuously worked for Krater Electric between 1991 and 2007, Shannon worked for the company for only about six years during that period of time. ECF Nos. 55 & 58 at ¶ 106. She started to work at Krater Electric in August 1991, after marrying Bradley. ECF No. 55-9 at 3; Shannon Krater Dep. at 6. She left the company in December 1993, after giving birth to a son. ECF No. 55-9 at 3; Shannon Krater Dep. at 7. Shannon returned to Krater Electric as a secretary in 2003, after learning from Bradley that a position was available. ECF No. 55-9 at 4; Shannon Krater Dep. at 11.

Shannon indicated that Bradley had been involved with Krater Electric's day-to-day operations. ECF No. 55-9 at 5; Shannon Krater Dep. at 15. Nonetheless, she testified that he had been under both his grandfather and his father in the administrative hierarchy. ECF No. 55-9 at 5; Shannon Krater Dep. at 16. Bradley's father, Kenneth Krater, Jr., was apparently Krater Electric's Chief Executive Officer ("CEO"). *Id.* Shannon testified that while Bradley had sometimes been involved with Krater Electric's hiring process, the ultimate authority to hire

employees had resided with Kenneth.  ECF No. 55-9 at 6; Shannon Krater Dep. at 18-19.  She explained that Bradley had played no role in terminating Krater Electric employees.  ECF No. 55-9 at 6; Shannon Krater Dep. at 19.  Although Shannon stated that Bradley had possessed the authority to sign off on small contracts, she testified that large contracts had to be approved by his father or grandfather.  ECF No. 55-9 at 7; Shannon Krater Dep. at 24-25.  Shannon also explained that she had been forced to "beg" Kenneth for a pay raise whenever she felt that additional compensation was warranted.  ECF No. 55-9 at 12; Shannon Krater Dep. at 45.

Bradley and Shannon are the owners and operators of Krater Services.  ECF Nos. 55 & 58 at ¶ 20.  The record contains no evidence suggesting that Kenneth controls Krater Services' operations.  Krater Services hired nine former Krater Electric employees on September 1, 2007.  ECF No. 55-13.  Krater Electric was dissolved on that date.  ECF No. 55-8.  The Union intimates that Kenneth played a role in convincing Krater Electric's former employees to work for Krater Services.  ECF No. 55 at ¶¶ 25-26.  The record contains no evidence to support the Union's suspicion.

Shannon testified that she and Bradley had met with some Krater Electric employees on their own time in order to inform them that Krater Services was being created.  ECF No. 55-9 at 18; Shannon Krater Dep. at 82-83.  She stated that Kenneth's permission to conduct this meeting had not been necessary, since it had not been held during Krater Electric's business hours.  *Id.* Kenneth apparently met with the employees to inform them that he had decided to close Krater Electric.  ECF No. 55-9 at 17; Shannon Krater Dep. at 78-79.  Shannon testified that she had not been present for the meeting.  *Id.* When questioned about it during the course of his deposition, Bradley described the meeting as follows:

16

Q.     At some point in time did Ken Krater, Sr. have a meeting with the employees in which he made the official announcement that Krater Electric Services, Incorporated was closing?

A.     I vaguely remember him having a meeting where he sat down with all of us in an office and stated he appreciated the time—I think this was—I don't even remember. I just know that he said he appreciated working with us, he enjoyed the men and appreciated the hard work and effort they put in while they worked for him and wished them well if they decided to go with me or—I don't even know if that was—if we even had the conversation with them yet. But he basically said he appreciated the time that they had served him, and he, you know, was closing down the business, and he wished them well with whatever they did and encouraged them to continue to do their best wherever they ended up, whatever they decided to do.

ECF No. 55-11 at 20; Bradley Krater Dep. at 78. Bradley's testimony could, at most, give rise to an inference that Kenneth may have briefly mentioned Krater Services as an alternative employment option for his employees when he announced his decision to close Krater Electric. It does not support the Union's implicit contention that Kenneth actively recruited his outgoing employees to work for Krater Services.[6]

Barry Surma ("Surma") is employed as the ABCD Corp.'s Director of Finance and Development Programs. ECF No. 52 at 7; Surma Dep. at 7. Surma met with Bradley and Shannon on August 13, 2007, to discuss their need for financial assistance in connection with the creation of Krater Services. *Id.* at 15-16. The documentary record contains a copy of handwritten notes taken by Surma during the course of the meeting. ECF No. 55-14. One notation makes reference to the fact that nine employees were "moving over" from Krater Electric to Krater Services. *Id.* at 1. The Union presents this notation as evidence of collaboration between Krater Electric and Krater Services to move the employees from one entity to the other. ECF No. 55 at ¶ 24.

---

[6] The record contains no testimony from the nine former Krater Electric employees concerning the manner in which they were recruited to work for Krater Services.

17

During the course of a deposition conducted on May 12, 2009, Surma was asked about his notation concerning the nine employees. ECF No. 52 at 16-17; Surma Dep. at 16-17. In response to questions posed by the Union's counsel, Surma testified as follows:

Q.   Is this your handwriting?

A.   Yes.

Q.   It states here on the document that you just presented to me ABOUT 9 EMPLOYEES MOVING OVER. Do you know what that's in reference to?

A.   They said about nine employees would be brought on.

Q.   The language here says MOVING OVER. Do you know where the employees were moving over from?

A.   They talked about running their operation out of their home.

Q.   When it states ABOUT 9 EMPLOYEES MOVING OVER, was there any mention about nine employees were moving from the corporation to the LLC?

A.   No, just that they would be hiring people. They estimated roughly about eight people. One of the things we talked about is based on the amount of financing, something that you always do in economic development financing, never commit more jobs than you have to.

Q.   You used the language that they're bringing on nine employees. Would you agree with me that bringing on nine employees is a different terminology than moving nine employees over?

A.   Not necessarily. Bring in implies hiring.

*Id.* (capitalization in original). Surma's testimony suggests that the notation was never meant to be a precise description of the manner in which Krater Services was planning to hire Krater Electric's employees. Even if the notation is read to establish that Bradley and Shannon knew as early as August 13, 2007, that their new company would be hiring nine Krater Electric employees, it does not contradict the testimonial evidence concerning the manner in which the

personnel "moves" were effectuated. Bradley testified that he and Shannon had met with the employees in "[e]ither July or August" of 2007 to inform them that Krater Services was being created, and that they were welcome to work for the new company. ECF No. 55-11 at 24; Bradley Krater Dep. at 99-100. Nothing in Surma's handwritten notes contradicts this testimony.

On October 16, 2007, Bradley and Shannon submitted a "business plan" to Surma in support of their application for a business loan from the ABCD Corp. ECF No. 55-24 at 1-17. The "competitive analysis" portion of the business plan stated as follows:

> Our main competitors include Bettwy Electric, Neff Electric, Adams Electric and Randy's Electric. Due to our relationship with the former Krater Electric Service, we have been in competition with these companies for several years. With the exception of Randy's Electric, Krater has had a ver y good working relationship with the other companies listed for many years. When necessary, we have referred customers to these companies in the past and they have referred customers to us as well. Randy's Electric is relatively new in the community and there has never been an opportunity to develop any type of working relationship with this company.
> The name of Krater in Central Pennsylvania is synonymous with trustworthy and dependable service at a fair price. Krater Electric Service was in business for 55 years. It closed its doors to this type of service and will now only provide very large commercial electrical work as of August 31, 2007.
> Krater Services, LLC opened for business on September 1, 2007. Due to a strong relationship with customers that Brad had formed while working at Krater Electric Service, we are confident of the fact that many of these customers will become loyal customers of Krater Services. We are also confident that people will not consider us to be a brand new company because of name recognition and the work that they have done with Brad in the past.

*Id.* at 5-6. Paul Cooney ("Cooney"), a Loan Development Specialist employed by the ABCD Corp., restated this portion of Krater Services' business plan in a "credit analysis" dated October 23, 2007. ECF No. 60-1 at 2-3. Cooney prepared the credit analysis in support of Krater Services' application for a business loan. ECF No. 52-2 at 47; Cooney Dep. at 47. Cooney made the following statements in a separate part of the credit analysis:

Despite being a "new" business the startup of Krater Services, LLC is more of a business transition than a startup. Mr. Krater has 17 years of experience in the electrical field and his staff includes 8 experienced full time employees that have remained loyal to the Krater family.

ECF No. 55-22 at 6. The Union relies on the language found in the business plan and the credit analysis to buttress its position that Krater Services is simply Krater Electric by another name. ECF No. 54 at 12-13.

Shannon testified that the relevant language of the business plan was simply an attempt to demonstrate that Bradley's experience at Krater Electric would increase the chances that Krater Services would be a successful business. ECF No. 55-9 at 28; Shannon Krater Dep. at 122. Her testimony was consistent with that of Cooney, who explained that his reference to the "startup" of Krater Services as a "business transition" had simply been an attempt to convince the ABCD Corp.'s "loan review committee" that the business was likely to succeed. ECF No. 52-2 at 48; Cooney Dep. at 48. Both Cooney and Surma testified that they had regarded Krater Services as a new business, and that there had been nothing unusual about this type of startup scenario. ECF No. 52 at 43; Surma Dep. at 43; ECF No. 52-2 at 49; Cooney Dep. at 49; ECF No. 52-3 at 4-5; Cooney Dep. at 54-55.

The Union also brings to the Court's attention a brief article that appeared in the December 2, 2007, edition of the *Altoona Mirror*. *Id.* at 13-14. After Krater Services' application for a business loan was approved, the *Altoona Mirror* reported as follows:

**Application for $100,000 loan OK'd**
The Blair County Planning Commission approved an application for a $100,000 loan through the USDA Rural Development program.
The loan is expected to help Bradley and Shannon Krater start a business called Krater Services LLC, an affiliate of Bradley Krater's father's business, Krater Electric.

ECF No. 55-28 (boldface type in original). The Union emphasizes that the article referred to Krater Services as an *affiliate* of Krater Electric. ECF No. 54 at 13-14.

When questioned about the article, Shannon took issue with two specific parts of the article. First, she denied that Krater Services was an "affiliate" of Krater Electric. ECF No. 55-9 at 29; Shannon Krater Dep. at 128; Second, she pointed out that Krater Electric was owned by Bradley's *grandfather* rather than by his *father*. *Id.* Shannon testified that she and Bradley had considered the idea of contacting the *Altoona Mirror* for the purpose of correcting these inaccuracies, but that they had declined to do so pursuant to legal advice provided by their counsel.[7] *Id.*

The testimonial evidence indicates that Bradley never became the immediate heir to Krater Electric. Both Shannon and Bradley testified that Bradley's father, Kenneth Krater, Jr., and his uncle, Robert Krater, had been expected to assume control of the business. ECF No. 55-9 at 18; Shannon Krater Dep. at 82-84; ECF No. 55-11 at 16-17; Bradley Krater Dep. at 65-66. Bradley explained that while he had "worked well" with his grandfather, he had not always seen "eye to eye" with his father. ECF No. 55-11 at 16; Bradley Krater Dep. at 65. Shannon stated that Bradley's father had gone on to work for a Home Depot business after the dissolution of Krater Electric. ECF No. 55-9 at 20; Shannon Krater Dep. at 92. The record contains no evidence suggesting that Krater Services is controlled or operated by Bradley's grandfather, father or uncle. Although Shannon's parents provided Krater Services with both financial assistance and a new vehicle, the record is devoid of evidence suggesting that similar forms of

---

[7] The newspaper article does not constitute competent evidence that Krater Services was an "affiliate" of Krater Electric. *Tasini v. New York Times Co.*, 184 F.Supp.2d 350, 357, n. 8 (S.D.N.Y. 2002). The copy of the article provided by the Union establishes only the fact that Krater Services was *described* as an "affiliate" of Krater Electric. *Id.*

21

assistance were provided by relatives on Bradley's side of the family. ECF No. 55-9 at 26; Shannon Krater Dep. at 115-116.

Bradley testified that he and Shannon were responsible for making all business decisions for Krater Services, and the Union points to no evidence which contradicts this testimony. ECF No. 55-11 at 28; Bradley Krater Dep. at 115. In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court stated that a federal court considering a motion for summary judgment "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, p. 300 (2d ed. 1995). Relying on *Reeves*, the Union argues that Krater Services cannot establish its entitlement to summary judgment on the basis of testimony provided by Bradley and Shannon, who are interested witnesses. ECF No. 60 at ¶¶ 1-7. The reading of *Reeves* advocated by the Union, however, was rejected by the United States Court of Appeals for the Third Circuit in *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2007). In *Lauren W.*, the Court of Appeals declared that a court considering a motion for summary judgment should reject the uncontradicted testimony of an interested witness only where his or her testimony is "inherently implausible." *Lauren W.*, 480 F.3d at 271-272. There is nothing "inherently implausible" about the testimony given by Bradley and Shannon. Consequently, it must be credited to the extent that it is not contradicted by other evidence contained in the record. *Id.*

The Union's failure to establish that Kenneth controls or operates Krater Services, or that Bradley controlled or operated Krater Electric, weighs heavily against a determination that

22

Krater Services is an alter ego of Krater Electric. The United States Court of Appeals for the Third Circuit has referred to an old company's "substantial degree of control" over a new company as "[t]he crucial element in a decision to apply the alter ego doctrine." *NLRB v. Scott Printing Corp.*, 612 F.2d 783, 786 (3d Cir. 1979). In *NLRB v. Omnitest Inspection Services, Inc.*, 937 F.2d 112, 114 (3d Cir. 1991), the Court of Appeals held that an absence of common ownership does not automatically preclude a finding that an alter-ego relationship exists between two employers, provided that "the employers have substantially the same management, business purpose, operations, equipment, and customers." The holding in *Omnitest Inspection Services* was premised on the notion that, "depending on the facts of the case, actual control can be more significant than formal ownership." *Omnitest Inspection Services*, 937 F.2d at 118. In that case, the Court of Appeals determined that "it [was] actual control that highlight[ed] whether the change in formal ownership between the old and new employers [was] the type of 'mere technical change in the structure or identity' of an employer that [was] proscribed by the alter ego doctrine." *Id.* at 120 (footnote omitted), quoting *Howard Johnson*, 417 U.S. at 259, n. 5. The Court of Appeals also explained that it was permissible for "a person with a minority ownership interest in a business" to "legitimately buy the business" or "form a new company to do the same type of business." *Omnitest Inspection Services*, 937 F.2d at 259, n. 5. The Court is aware of no case in which the Supreme Court or the Court of Appeals has sustained an administrative finding of an alter-ego relationship in the absence of evidence demonstrating the existence of either common ownership or common control. *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 554 (3d Cir. 1983)("This evidence supports the finding that Bryant retained sufficient control over the affairs of Associates to meet the alter ego criteria applied by this court . . . .").

There are other factors which weigh against a finding that Krater Services is an alter ego of Krater Electric. It is undisputed that Krater Services never utilized or purchased real or personal property owned by Krater Electric, with the exception of an insulation trailer that was rented to Krater Services at fair market value. ECF Nos. 50 & 60 at ¶¶ 4-5. Krater Services does not share the same location as Krater Electric. *Id.* at ¶¶ 119-121. As noted earlier, the financial support for Krater Services came from Bradley's IRA, money provided by Shannon's parents, and a business loan obtained from the ABCD Corp. ECF Nos. 50 & 60 at ¶ 2. The record contains no evidence suggesting that Krater Services receives financial assistance from Bradley's grandfather, father or uncle, or that these individuals maintain an interest in Krater Services' operations. ECF No. 52-3 at 1-4; Cooney Dep. at 51-54. The evidentiary record simply fails to support the Union's contention that Krater Services is "merely a disguised continuance" of Krater Electric. *Southport Petroleum*, 315 U.S. at 106.

It must be acknowledged that some factors weigh in favor of the Union's position. Krater Services has the same "business purpose" as Krater Electric. *Trafford Distribution Center*, 478 U.S. at 179. Many of Krater Services' customers are former customers of Krater Electric. ECF No. 55-31. Indeed, the business plan prepared by Bradley and Shannon expressly stated that Krater Services intended to attract Krater Electric's old customers. ECF No. 55-24 at 6. In some instances, Krater Services completed jobs that had been accepted by Krater Electric for the same prices that had previously been proposed by Krater Electric. ECF Nos. 55-17, 55-18, 55-19, 55-20, 55-21. Bradley testified that he had submitted bids to Krater Electric customers on behalf of Krater Services after learning from his father or grandfather that Krater Electric would not be able to complete the jobs. ECF No. 55-11 at 16; Bradley Krater Dep. at 62-63. All of Krater Services' original employees were former employees of Krater Electric. ECF No. 55-13.

Shannon testified that Krater Services had paid the employees the same compensation that had previously been paid to them by Krater Electric, since it would not have been easy for the employees to absorb pay cuts. ECF No. 55-9 at 21; Shannon Krater Dep. at 95. Mark Salisbury ("Salisbury"), a master electrician, apparently worked for Krater Services before the employer designated on his electrical permit was changed from Krater Electric to Krater Services. ECF No. 61-1 at 6. Krater Services purchased office supplies at Sam's Club after presenting Krater Electric's membership card. ECF No. 55-29. While these factors all weigh against Krater Services, they cannot carry the day under the precise circumstances of this case. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 291, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)(remarking that a successor's duty to comply with a preexisting collective bargaining agreement does not "ensue as a matter of law from the mere fact that an employer is doing the same work in the same place with the same employees as [its] predecessor").

Kenneth's decision to dissolve Krater Electric was apparently triggered by a "definite hardening" in the Union's position. ECF No. 55-8. Both Bradley and Shannon testified that they had always wanted Krater Services to be a non-union company. ECF No. 55-9 at 15; Shannon Krater Dep. at 58-59; ECF No. 55-11 at 9; Bradley Krater Dep. at 30-32. Shannon attributed the decision to create Krater Services to Kenneth's repeated threats to close Krater Electric.[8] ECF No. 55-9 at 20; Shannon Krater Dep. at 91. Bradley expressed a belief that the unionization of Krater Electric had rendered the business unprofitable, and that he did not want the same thing to happen to Krater Services. ECF No. 55-11 at 9; Bradley Krater Dep. at 30-32. The Union relies on the "anti-union animus" allegedly exhibited by the Kraters to buttress its position. ECF No. 54 at 6-8. It is true that an employer's anti-union sentiment is often a "critical

---

[8] The fact that Kenneth's decision to close Krater Electric was heavily influenced by his dispute with the Union did not render that decision unlawful. *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 273-274, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

25

variable" in the alter-ego analysis. ECF No. 54 at 8. Nevertheless, the authority relied upon by the Union does not support the idea that an employer's intent to evade its obligations under a collective bargaining agreement can warrant a finding of alter-ego status in the absence of evidence establishing some level of common control between two distinct entities. *Omnitest Inspection Services*, 937 F.2d at 119 (stating that "the old employer's motivation in forming the new employer and the degree of control the old employer exercises over the new employer's business are critical variables in the alter ego determination").

In *NLRB v. Bell Co.*, 561 F.2d 1264 (7th Cir. 1977), the United States Court of Appeals for the Seventh Circuit addressed a situation that was factually analogous to the present situation. In that case, a company was owned by four brothers. *Bell Co.*, 561 F.2d at 1266. A fifth brother acted as the company's general manager. *Id.* The general manager's son, who was also a nephew of the four owners, served as the company's president. *Id.* Although the president was authorized to unilaterally bid on small jobs, he could not finalize deals involving large jobs without the consent of the owners. *Id.* The president was asked to resign because the company was losing money, and the company closed down less than two weeks later. *Id.* Less than a month after the closure of the company, the former president started a new company that employed some of the old company's former employees, purchased some of the old company's equipment at "greatly discounted" prices, served many of the old company's former customers, and initially operated out of the same building as the old company. *Id.* at 1266-1267. The new company refused to honor the collective bargaining agreements that had been executed by the old company. *Id.* at 1267. The Court of Appeals refused to sustain the NLRB's finding that the new company was an alter ego of the old company, since the record contained no evidence suggesting that the owners of the old company had maintained control over the new company or

reaped a benefit from its operation. *Id.* at 1268. The NLRB's alter-ego determination was set aside even though "anti-union feelings" had motivated the owners' decision to close the old company. *Id.* In *Omnitest Inspection Services*, the United States Court of Appeals for the Third Circuit referred to the situation in *Bell Co.* as an example of "an arm's-length transaction" facilitating the formation of a "new employer." *Omnitest Inspection Services*, 937 F.2d at 120, n. 5.

The reasoning employed in *Bell Co.* strongly supports the position advanced by Krater Services in this case. Bradley was two generations removed from the owners of Krater Electric, and he had no authority to bid on large jobs without the approval of his father or grandfather. ECF No. 55-11 at 6; Bradley Krater Dep. at 19. Bradley's father, who was a direct heir to Krater Electric, went to work for a Home Depot business after Krater Electric was dissolved. ECF No. 55-9 at 20; Shannon Krater Dep. at 92. The record contains no evidence suggesting that Bradley's father, grandfather or uncle benefitted from Krater Services' creation. *Bell Co.*, 561 F.2d at 1268. Bradley and Shannon played no role in negotiating Krater Electric's CBA with the Union. *Howard Johnson*, 417 U.S. at 259, n. 5. Krater Services was independently created by Bradley and Shannon without the assistance of Krater Electric's owners. ECF Nos. 50 & 60 at ¶ 2. Shannon's parents were the only relatives involved with Krater Services' finances. ECF No. 52 at 36, 42; Surma Dep. at 36, 42. Under these circumstances, it cannot be said that the dissolution of Krater Electric and creation of Krater Services constituted "a paper transaction without meaningful impact on the ownership or operation of the enterprise." *Howard Johnson*, 417 U.S. at 259, n. 5.

When the NLRB petitions a federal court for the enforcement of an order, its findings of fact are to be regarded as "conclusive" to the extent that they are "supported by substantial

27

evidence on the record considered as a whole." 29 U.S.C. § 160(e). In that context, a reviewing court is not free to substitute its view of the record for that of the NLRB even if it would have reached different conclusions in a *de novo* proceeding. *Stardyne*, 41 F.3d at 151. This case, however, comes before the Court for an initial determination as to whether Krater Services is an alter ego of Krater Electric. There are no administrative findings for the Court to review. Since the Union is the party seeking relief, it bears the burden of proving that Krater Services is "merely a disguised continuance" of Krater Electric. *Schaffer v. Weast*, 546 U.S. 49, 51, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); *Southport Petroleum*, 315 U.S. at 106. The Union offers no testimonial evidence directly supporting its position. The record contains no testimony from the nine Krater Electric employees who were later hired by Krater Services.[9] In an affidavit dated July 8, 2010, Tom O'Donnell ("O'Donnell"), a former agent of the Union, expressed a subjective belief that Krater Services was an alter ego of Krater Electric, and that it had been created solely for the purpose of facilitating Krater Electric's evasion of the CBA. ECF No. 61-1 at ¶¶ 7-8; O'Donnell Aff. at ¶¶ 7-8. These statements constitute nothing more than legal conclusions that cannot be regarded as competent factual evidence.[10] *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 256, n. 21 (3d Cir. 1982)(disregarding the portion of an affidavit "containing legal conclusions"). The testimony provided by Bradley and Shannon is not directly contradicted by the documentary evidence. Both Surma and Cooney understood Krater Services to be a new company despite the statements in the business plan purporting to associate the entity with Krater

---

[9] The primary purpose of the alter-ego doctrine is to provide "a degree of protection for the legitimate expectations of workers who enter into a collective bargaining agreement with the understanding that it will continue to apply so long as they are working for what they regard as the 'same' employer." *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 148 (3d Cir. 1994). It is difficult to fathom how the Union believes that it can establish the existence of an alter-ego relationship between Krater Electric and Krater Services without offering any evidence as to how these two entities were regarded by their employees.

[10] O'Donnell's affidavit appears to have been filed for the sole purpose of establishing that the Union commenced this action in a timely manner. ECF No. 61 at 7-8. It relates to *when* O'Donnell suspected that an alter-ego relationship existed between Krater Electric and Krater Services rather than to *whether* such a relationship existed in the first place. ECF No. 61-1 at ¶¶ 2-8; O'Donnell Aff. at ¶¶ 2-8.

Electric's reputation. ECF No. 52 at 43; Surma Dep. at 43; ECF No. 52-2 at 33; Cooney Dep. at 33. The evidence presented by the Union establishes only facts that Krater Services does not dispute. Since no genuine issue of material fact exists, the Court will grant the motion for summary judgment filed by Krater Services and deny the motion for summary judgment filed by the Union.[11]

## VI. CONCLUSION

The Court acknowledges that an alter-ego relationship can exist between two entities even if some relevant factors suggest otherwise. *Trafford Distribution Center*, 478 F.3d at 179. Nevertheless, a party cannot establish the existence of such a relationship without presenting some evidence demonstrating that both entities are either owned or controlled by the same individual (or group of individuals). *Omnitest Inspection Services*, 937 F.2d at 120 ("We conclude here that it is actual control that highlights whether the change in formal ownership between the old and new employers is the type of 'mere technical change in the structure or identity' of an employer that is proscribed by the alter ego doctrine."), quoting *Howard Johnson*, 417 U.S. at 259, n. 5; *Scott Printing Corp.*, 612 F.2d at 786 ("The crucial element in a decision to apply the alter ego doctrine, however, is a finding that the older company continued to maintain a substantial degree of control over the business claimed to have been sold to the new entity."); *Bell Co.*, 561 F.2d at 1267 ("The cases relied upon by the NLRB have as a common element the continued control or ownership of the new business by the owners of the old company."). The

---

[11] In the memorandum opinion and order denying Krater Services' motion to dismiss, the Court held that it had subject-matter jurisdiction to determine whether Krater Services was an alter ego of Krater Electric. ECF No. 28 at 4-5. In so holding, the Court relied on the decision of the United States District Court for the Southern District of New York in *Local Union No. 38 v. A&M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F.Supp.2d 332 (S.D.N.Y. 2004). The reasoning employed in *Local Union No. 38* indicates that the Court has jurisdiction to enter a judgment in favor of Krater Services with respect to the alter-ego issue. *Local Union No. 38*, 314 F.Supp.2d at 353, n. 15. Since Krater Services' alleged status as an alter ego of Krater Electric was the Union's sole basis for tying Krater Services to a contractual obligation, the determination that no alter-ego relationship exists between the two entities effectively precludes the Court from exercising further jurisdiction under § 185(a). *Id.* at 352-353.

29

decisions relied upon by the Union involved situations in which some form of common ownership or control had been established. *Trafford Distribution Center*, 478 F.3d at 176; *Eichleay Corp.*, 944 F.2d at 1059. This case is more akin to the situation discussed in *Bell Co.*, which the United States Court of Appeals for the Third Circuit has cited as an example of "an arm's-length transaction" designed to legitimately "form a new company to do the same type of business" as a preexisting company. *Omnitest Inspection Services*, 937 F.2d at 120, n. 5.

Krater Electric, of course, remains subject to the Labor-Management Committee's decision of November 20, 2006, and this Court's stipulated judgment of September 8, 2008. Krater Services, however, cannot be saddled with Krater Electric's obligations. *Stardyne*, 41 F.3d at 148. Bradley and Shannon were not precluded from starting their own business simply because they were related to Kenneth. *Local Union No. 38*, 314 F.Supp.2d at 349-350. Accordingly, Krater Services' motion for summary judgment (*ECF No. 48*) will be granted, and the Union's motion for summary judgment (*ECF No. 53*) will be denied. An appropriate order follows.

AND NOW, this 25th day of March, 2011, this matter coming before the Court on the cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56, IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment (*ECF No. 48*) is **GRANTED**, and that the Plaintiff's Motion for Summary Judgment (*ECF No. 53*) is **DENIED**.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record